UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___6/23/2021___

Keysha Montgomery,

                              Plaintiff,

              -against-

Commissioner of Social Security,

                              Defendant.

1:20-cv-03939 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Keysha Montgomery ("Montgomery" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Not. of Mot., ECF No. 13; Comm'r Not. of Mot., ECF No. 15.)

For the reasons set forth below, Plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED.

## I.   Procedural Background

On January 17, 2017, Plaintiff filed applications for DIB and SSI, with an alleged onset date

of July 1, 2016.[1] (Administrative R., ECF. No. 10 (hereinafter "R."), at 136.) The Social Security

Administration ("SSA") denied Plaintiff's applications on April 24, 2017. (R. 136.) Thereafter,

Plaintiff requested a hearing, which was held on December 4, 2018 before Administrative Law

Judge ("ALJ") Marguerite Toland. (R. 607-39.) ALJ Toland denied Plaintiff's claim in a decision

dated April 1, 2019. (R. 136-47.) Plaintiff appealed to the Appeals Council. (R. 130-32.) ALJ

Toland's decision became the Commissioner's final decision when the Appeals Council denied

Plaintiff's request for review on April 9, 2020. (R. 1-4.) This action followed.

## II.   Non-Medical Evidence

Born on March 1, 1967, Plaintiff was 49 years old on the alleged onset date and 51 years

old at the time of the 2018 hearing. (R. 146.) Plaintiff has a college education and past relevant

work as a social worker. (R. 145-46, 614-15.)

## III.   Relevant Medical Evidence

### A.   Lincoln Medical And Mental Health Center

On July 1, 2016, Montgomery was admitted to Lincoln Medical and Mental Health Center

("Lincoln Medical Center") with a Helicobacter pylori ("H. pylori")[2] induced gastric ulcer

---

[1] To qualify for DIB, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A),(E); 20 C.F.R. §§ 404.101, 404.120, 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). Plaintiff's DLI is December 31, 2021. (R. 139.)

[2] H. pylori "is a common type of bacteria that infects the stomach." *Cabrera v. Berryhill*, No. 17-CV-06803 (PAE) (HBP), 2019 WL 1062108, at *3 n.9 (S.D.N.Y. Jan. 16, 2019), *report and recommendation adopted*, 2019 WL 1059995 (S.D.N.Y. Mar. 6, 2019) (citation omitted).

perforation. (R. 957-60.) Dr. Ali Raza, M.D. performed an exploratory laparotomy and a Graham patch repair of the ulcer. (R. 959-62, 966.) Following surgery, Montgomery remained intubated and ventilated for several days. (R. 947-49.) By July 8, 2016, Montgomery no longer required ventilation and was able to get out of bed. (R. 943, 945.) On July 12, 2016, Dr. Kathleen Berger, M.D. performed a physical examination of Montgomery and attending physician Meno Lueders, M.D. noted that she was "[c]linically much improved." (R. 946.) Montgomery continued to receive treatment for the H. pylori infection through July 14, 2016. (R. 936.)

During a follow-up visit with Physician Assistant ("PA") Folashade Bello on December 28, 2016, Montgomery reported "occasional epigastric [p]ain which [wa]s well controlled with [medication]." (R. 932-33.) Plaintiff complained of difficulty sleeping and reported that she did better with Ambien than Benadryl. (R. 933.) Upon physical examination, PA Folashade noted that Montgomery's "wound [was] healing well," that Montgomery's abdomen incision was "completely healed," and that Montgomery's abdomen was soft and non-tender. (*Id.*) PA Folashade prescribed Montgomery Ambien with no refills and referred her for psychiatric evaluation for evaluation of anxiety. (R. 934.)

On February 13, 2017, Montgomery presented to the Lincoln Medical Center primary care clinic for an outpatient visit with Dr. Joe Lequerica, M.D. (R. 927-30.) Montgomery denied anxiety and depression. (R. 928-29.) Upon physical examination, Dr. Lequerica noted that Montgomery was not in acute distress, that Montgomery had normal joint range of motion, and that Montgomery had no effusion, tenderness or deformities. (R. 929.) With regards to Montgomery's Graham patch surgery, Dr. Lequerica noted "H. pylori since treated and followed with surgery clinic with excellent results of laparotomy." (*Id.*) Dr. Lequerica diagnosed Montgomery with

essential hypertension and recommended Montgomery return for a follow-up appointment in three months. (R. 930.)

Montgomery returned to the clinic on March 19, 2017, complaining of experiencing abdominal pain once per week. (R. 1089.) According to the triage note, Montgomery was ambulatory with a normal gait, and an examination of Montgomery's back revealed that she was in no acute respiratory distress. (R. 1090.)

On October 31, 2017, Montgomery presented to the Lincoln Medical Center emergency room complaining of shortness of breath and wheezing. (R. 1034-35, 1071-73.) According to the triage note, Montgomery appeared to be in "mild/moderate distress." (R. 1072.) Montgomery was diagnosed with "[u]nspecified asthma with (acute) exacerbation," and upon discharge, Montgomery was prescribed Ventolin HFA inhalation aerosol solution and Prednisone oral tablets. (R. 1034.)

During a subsequent visit on February 16, 2018, Montgomery complained of irritation pain around her surgical scar and abdominal area. (R. 1068.) According to the triage note, Montgomery was not in any distress and was ambulatory with a normal gait. (R. 1068-69.) Upon discharge, Montgomery was not given any prescriptions. (R. 1036.)

On April 21, 2018, Montgomery presented to the emergency room complaining of left ankle pain and swelling and left shoulder pain resulting from a fall down the stairs of her church. (R. 1038-39, 1045-46, 1061-67, 1083-85.) An x-ray of Montgomery's left shoulder was "unremarkable," and an x-ray of Montgomery's left ankle showed the ankle intact. (R. 1084.) Additionally, Montgomery exhibited no head, back, hip or knee injury. (*Id.*) Upon discharge,

Montgomery was given pain medication, told to wear an ACE bandage and orthopedic boot on her left ankle, and told to use a cane. (*Id.*)

On June 9, 2018, Montgomery presented to the emergency room complaining of falls and depression. (R. 1051.) Dr. Ali Khairat, M.D. noted that Montgomery reported multiple falls over the last year, including a fall that morning which occurred when Montgomery's knee gave way while going to the bathroom. (R. 1051, 1053.) Montgomery reported lower left extremity numbness and tingling, but denied weakness, and Dr. Khairat found pain on palpation of knees bilaterally. (*Id.*) Despite this pain on palpation of knees bilaterally, Montgomery had a normal gait, normal range of motion, and "5/5 strength" of her bilateral lower extremities. (R. 1055.) Additionally, x-rays of Montgomery's bilateral knees revealed normal mineralization of bone, normal joint space, good bone alignment, and no acute fracture or dislocation. (R. 1044, 1051.) During the visit, Montgomery also reported "feeling 'sad' since her mother passed away," but declined an offer for a psychiatry consult. (R. 1054.) The attending physician, Dr. Benjamin Azan, M.D., noted that Montgomery's falls may be related to her use of sleep aids and advised her to decrease her use of sleep aids and follow up with her primary medical doctor. (R. 1055-56.)

### B. Montefiore Medical Center

On May 17, 2018, Dr. Jeffrey S. Schultz, M.D. saw Montgomery at Montefiore Medical Center for a consultation regarding her glaucoma.[3] (R. 1101.) Dr. Schultz noted that Montgomery's vision was 20/25 bilaterally, and that Montgomery's eye pressure was 30 on the right and 39 on the left. (R. 1102.) Montgomery's visual fields were full. (R. 1103.) Dr. Schultz

---

[3] During a November 17, 2016 visit at Lincoln Medical Center, Plaintiff was diagnosed with glaucoma secondary to eye inflammation, with her left eye noted as being at the severe stage. (R. 919.)

determined that Montgomery had "primary open angle glaucoma of both eyes" at the intermediate stage, and that Montgomery had "[s]evere glaucomatous cupping [of her] left eye." (R. 1104.) Dr. Schultz further noted that Montgomery had poor intraocular pressure control, but that Montgomery had a relatively healthy appearing optic nerve head in her right eye. (*Id.*) Dr. Schultz prescribed Diamox and eye drops and noted that Montgomery may need glaucoma surgery. (*Id.*)

On June 5, 2018, Montgomery saw Dr. Schultz for another consultation regarding her glaucoma. (R. 268.) Dr. Schultz noted that primary open angle glaucoma had caused severe damage to Montgomery's left eye and that there was poor intraocular pressure control on all medicine, including Diamox. (R. 270.) Dr. Schultz further noted that Montgomery was "[a]t risk of permanent irreversible loss of remaining vision without surgical intervention." (*Id.*)

On June 18, 2018, Dr. Schultz performed an express shunt procedure with Mitomycin on Montgomery's left eye. (R. 286, 1094-97.) On June 19, 2018, the day following the surgery, Dr. Schultz noted that Montgomery's left eye "[l]ook[ed] good." (R. 1116.) Dr. Schultz instructed Montgomery to stop current glaucoma medications for her left eye, to take Prednisone acetate every two hours while awake, to take Ofloxacin four times a day, to wear a shield at night, and to limit strenuous activity. (*Id.*) For Montgomery's right eye, Dr. Schultz instructed Montgomery to continue taking her current glaucoma medications. (*Id.*)

During a follow-up visit on July 12, 2018, Dr. Schultz noted that Montgomery had 20/30 vision on the right side of her eye and 20/40 vision on the left side. (R. 1120.) Montgomery's eye pressure was 36 on the right and 10 on the left. (*Id.*) Additionally, Dr. Schultz noted that Montgomery had full visual fields on the right and left sides and full extraocular movement on

the right and left sides. (*Id.*) Dr. Schultz opined that Montgomery's left eye was "doing well," but also that Montgomery had elevated pressure in her right eye. (R. 1121.) Dr. Schultz concluded that Montgomery should consider possible surgery on her right eye. (*Id.*)

A letter from Dr. Schultz, dated October 24, 2019, indicates that Montgomery has been a long-time patient of his and that Montgomery "suffers from primary open angle glaucoma of the left eye and open angle with borderline findings and high glaucoma risk in the right eye." (R. 61.) Dr. Schultz's letter further states that Montgomery "has a long-standing history of glaucoma, which has caused severe damage" and that Montgomery underwent a "Right Eye Trabeculectomy with Mitomycin C to control her intraocular pressure." (*Id.*) Dr. Schultz concluded this letter by opining that Montgomery was "unable to return to work indefinitely." (*Id.*)

### C.     <u>New York-Presbyterian Medical Group/Queens</u>

Both before and after her alleged disability onset date, Montgomery saw Dr. Jaime Nieto, M.D., Director of Neurosurgery at the New York Hospital Medical Center of Queens ("New York-Presbyterian/Queens"), for treatment of back pain. (R. 856, 858-59, 865, 870-71, 875-82.) On October 28, 2013, Dr. Nieto performed an L4-5 laminectomy, bilateral decompression, and posterior lumbar interbody fusion. (R. 875.) During a post-op visit the following month on November 15, 2013, Montgomery reported that she felt "great" and was "very please[d] with the outcome" of her surgery, though she complained of "tenderness mainly on the left side." (R. 872.) Montgomery returned for periodic follow-up visits with Dr. Nieto through February 2015. (R. 848-55, 857, 860-64, 866-69, 872-74.)

On January 6, 2016, Montgomery presented to the emergency room complaining of low back pain and asthma. (R. 884-97.) Upon physical examination, Montgomery appeared "morbidly obese, awake, alert, and in no acute distress." (R. 894.) Montgomery's neck had full range of motion, and Montgomery's heart displayed regular rate and rhythm with no murmurs, gallops or rubs. (*Id.*) Upon a musculoskeletal examination, Montgomery exhibited full range of motion in all four extremities. (*Id.*) Montgomery had mild lumbar midline tenderness, but full range of motion in her back and an x-ray of the lumbar spine showed no acute abnormality. (R. 894-95.) Additionally, Montgomery exhibited no focal neurological deficit. (R. 894.) Montgomery was discharged with prescriptions for Proventil and an inhaler. (R. 895.)

On February 28, 2017, Montgomery saw Dr. Nieto for another consultation regarding her lower back pain. (R. 1028-30.) During this visit, Montgomery reported myalgias, or muscle pain, as well as weakness and numbness. (R. 1030.) Dr. Nieto noted that Montgomery's pain was stable and that Montgomery's x-rays "look[ed] good." (*Id.*) Dr. Nieto encouraged Montgomery to lose weights, but opined that Montgomery could return to her normal activities. (*Id.*)

In a letter of medical necessity dated December 5, 2018, Dr. Nieto noted that Montgomery "is under [their] care for a medical diagnosis herniated disc of lumbar spine in which she has a lumbar spine surgery." (R. 1128.) Dr. Nieto recommended that Montgomery use a cane for ambulatory purposes. (*Id.*) Dr. Nieto noted that Montgomery "has lower extremity weakness and [that] the cane will assist with ambulation." (*Id.*)

**D. Dr. Arlene Broska, Ph.D. – March 23, 2017 Psychiatric Consultative Examination**

On March 23, 2017, Montgomery saw consultative examiner Dr. Arlene Broska, Ph.D. at Industrial Medicine Associates, P.C. for a psychiatric evaluation. (R. 1010.) Montgomery reported

her "medical conditions to be sarcoidosis,[4] H. pylori, asthma, leg cramps, back problem/pain, asthma [sic], diabetes, high blood pressure." (*Id*.) Montgomery reported having difficulty falling asleep and having dysphoria, "which comes and goes." (*Id*.) Montgomery reported having a normal appetite. (*Id*.) Montgomery also noted that she gets anxiety when going to the hospital for appointments and also when she touches the scar on her stomach. (*Id*.) Cognitively, Montgomery reported "being forgetful and having trouble concentrating." (*Id*.) Upon a mental status examination, Dr. Broska noted that Montgomery's recent and remote memory skills were mildly impaired and that Montgomery's "level of intellectual functioning is estimated to be in the average range with general fund of information appropriate to experience." (R. 1011.)

Dr. Broska opined that "[v]ocationally, there is no evidence of psychiatric limitation [of] understanding, remembering, or applying simple directions and instructions." (R. 1012.) Dr. Broska further noted that "[t]here is evidence for mild limitation [of] understanding, remembering, or applying complex directions and instructions," but that "[t]here is no evidence of limitation using reason and judgment to make work-related decisions, interacting adequately with supervisors, coworkers, and the public, sustaining concentration and performing a task at a consistent pace, sustaining an ordinary routine and regular attendance at work." (*Id*.) Dr. Broska opined that "[t]here is mild limitation in regulating emotions, controlling behavior, and maintaining well-being," and that "[t]here is no evidence of limitation maintaining personal

---

[4] "Sarcoidosis is a disease characterized by the growth of tiny collections of inflammatory cells (granulomas) in any part of [the] body – most commonly the lungs and lymph nodes[,] . . . [b]ut it can also affect the eyes, skin, heart and other organs." *Chambers v. Comm'r of Soc. Sec.*, No. 19-CV-02145 (RWL), 2020 WL 5628052, at *1 n.1 (S.D.N.Y. Sept. 21, 2020).

hygiene and appropriate attire or having an awareness of normal hazards and taking appropriate precautions." (*Id*.)

Dr. Broska concluded that "[t]he results of the examination appear to be consistent with psychiatric problems, but in itself this does not appear to be significant enough to interfere with [Montgomery]'s ability to function on a daily basis." (R. 1012.) Dr. Broska diagnosed Montgomery with "adjustment disorder with dysphoria and anxiety" and recommended individual psychological therapy. (*Id*.) The expected duration of impairment and timeframe for suggested therapy was six months. (*Id*.)

### E. Dr. John Fkiaras, M.D. – March 29, 2017 Consultative Examination

On March 29, 2017, Montgomery saw Dr. John Fkiaras, M.D. at Industrial Medicine Associates, P.C. for an internal medicine examination. (R. 1016.) Dr. Fkiaras noted that Montgomery's "pain in the low back is a 7 to 8/10 shooting pain which radiates to the left lower extremity." (*Id*.) Montgomery reported having "difficulty walking half a block, climbing 3 steps of stairs, lifting 5 lb, standing 30 minutes, and sitting 30 minutes." (*Id*.) Montgomery noted that oral medications provide a mild relief of the pain, but physical therapy in the past has not alleviated her pain. (*Id*.)

Dr. Fkiaras examined Montgomery, noting that Montgomery appeared to be in no acute distress, that her gait and stance were normal, but that she was unable to walk on heels and toes. (R. 1018.) Dr. Fkiaras also noted that Montgomery could squat one-third of the way down, that Montgomery used no assistive devices, that she needed no help changing for the examination or getting on and off the exam table, and that she was able to rise from her chair without difficulty.

(*Id.*) Upon examining Montgomery's abdomen, Dr. Fkiaras noted that there was "mild pain to palpation of the left upper quadrant and left lower quadrant." (*Id.*)

Upon a musculoskeletal examination, Dr. Fkiaras noted that Montgomery's cervical spine showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (R. 1018.) Montgomery exhibited no scoliosis, kyphosis, or abnormality in the thoracic spine. (*Id.*) Dr. Fkiaras further opined that Montgomery's lumbar spine showed flexion at 50 degrees, lateral flexion of the bilateral lumbar spine at 25 degrees, and lumbar spine rotation bilaterally at 25 degrees. (R. 1018-19.) Dr. Fkiaras also noted pain to palpation of the lumbar spine. (R. 1019.) Dr. Fkiaras noted that a straight leg raising ("SLR") test was positive on the left at 50 degrees in both the seated and supine positions and a supine SLR test was negative on the right.[5] (*Id.*) Montgomery had full range of motion of shoulders, elbows, forearms and wrists bilaterally. (*Id.*)

Dr. Fkiaras noted right hip flexion at 90 degrees, internal rotation of the right hip at 30 degrees, external rotation of the right hip at 40 degrees, backward extension of the right hip at 20 degrees, abduction of the right hip at 30 degrees and adduction of the right hip at 15 degrees. (R. 1019.) Dr. Fkiaras also noted left hip flexion at 80 degrees, internal rotation of the left hip at 30 degrees, external rotation of the left hip at 35 degrees, backward extension of the left hip at 20 degrees, abduction of the left hip at 30 degrees, adduction of the left hip at 15 degrees. (*Id.*) Montgomery had full range of motion of knees and ankles bilaterally, and Montgomery had no evidence subluxations, contractures, ankylosis or thickening. (*Id.*) Dr. Fkiaras opined that

---

[5] "Straight leg raising is 'a means of diagnosing nerve root compression, which can be caused by a herniated disc.'" *McCleese v. Saul*, No. 18-CV-04494 (AT) (SDA), 2019 WL 3037308, at *2 n.4 (S.D.N.Y. June 26, 2019), *report and recommendation adopted*, 2019 WL 3034892 (S.D.N.Y. July 11, 2019). "The patient lies flat while the physician raises the extended leg" and "if the patient feels pain in the back at certain angles (a 'positive test'), the pain may indicate herniation." *See id.*

Montgomery's joints were stable and nontender, and Montgomery exhibited no redness, heat, swelling or effusion. (*Id*.) Upon a neurological examination, Dr. Fkiaras noted that Montgomery had 4/5 strength in the right lower extremity and 5/5 strength in the rest of the extremities. (*Id*.) Montgomery also had 5/5 grip strength bilaterally. (*Id*.)

Dr. Fkiaras diagnosed Montgomery with the following: "(1) [h]istory of low back pain[;] (2) [h]istory of low back surgery in 2014[;] (3) [h]istory of H. pylori treated surgically in 2016[;] (4) [a]bdominal pain[;] (5) [n]ausea[;] (6) [d]iarrhea[;] (7) [l]eft eye glaucoma[;] (8) [a]sthma[;] (9) [s]arcoidosis[;] (10) [d]iabetes[; and] (11) [h]ypertension." (R. 1019-20.) Dr. Fkiaras opined that Montgomery was "restricted from any lifting, carrying, pushing, pulling squatting, kneeling, crouching, and bending." (R. 1020.) Dr. Fkiaras further opined that Montgomery should avoid "smoke, dust and known respiratory irritants"; that Montgomery had a "moderate limitation climbing multiple flights of stairs"; and that Montgomery had a "moderate limitation standing extended periods". (*Id*.)

## IV.    The December 4, 2018 Administrative Hearing

Montgomery appeared with counsel for an administrative hearing before the ALJ on December 4, 2018. (R. 607-39.)

### A.    Plaintiff's Testimony

Montgomery testified that, after undergoing back surgery in 2013, she returned to work until she was hospitalized in July 2016 for the H. pylori infection. (R. 612-13, 619-20.) Montgomery described pain (rated 10/10) in her back and legs, a tingling sensation in her fingers, and difficulty breathing. (R. 614, 620, 622, 624, 627.) Montgomery testified that she had difficulty walking and needed a cane; that she could not climb stairs; and that sometimes her legs gave

out. (R. 614, 620, 622, 624, 627-8.) Montgomery estimated that she could sit for up to twenty minutes at a time and stand for up to ten minutes at a time. (R. 626.) Montgomery further testified that she could walk only about a block and a half before she became short of breath. (*Id*.) Montgomery also testified that she could not lift a gallon of milk. (*Id*.)

Montgomery further described that she had difficulty seeing and could see only a "dot" out of her left eye. (R. 622-23.) Montgomery testified that she wore reading glasses and was bothered by the glare. (R. 623.) Montgomery also testified that she relied on her daughter and a home health aide to do her shopping and to help with household cleaning. (R. 626-27.) With respect to her mental impairments, Montgomery alleged that she thought about hurting herself, had paranoid thoughts, had lost her appetite, and experienced post-traumatic stress disorder symptoms. (R. 143.)

**B.    Vocational Expert Testimony**

Vocational Expert ("VE") Patricia Scutt also testified at the hearing. (R. 630-38.) The ALJ asked the VE to consider a hypothetical person with Montgomery's age, education, and work history with the Residual Functional Capacity ("RFC") to engage in a full range of light work with the additional limitations that the person could not climb ropes, ladders or scaffolds, but could occasionally climb ramps and stairs; could not crawl, but could occasionally stoop and kneel; must avoid concentrated exposure to dust, fumes, pulmonary irritants and temperature extremes; could use peripheral vision only occasionally; and could not operate automotive equipment or use dangerous machinery. (R. 631-32.) The VE testified that there were jobs in the national economy that such a hypothetical person could perform, including cleaner/housekeeper, bakery racker and garment folder. (R. 632-33.)

The ALJ asked the VE to further assume that the individual was limited to occasional decision-making and handling occasional changes in the workplace. (R. 636.) In response, the VE opined that the jobs identified still would be available. (*Id*.) When asked to further assume that the individual would need a cane for ambulation, the VE opined that the jobs of garment folder and cleaner/housekeeper still would be available. (R. 637-38.)

V.    **ALJ Toland's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since July 1, 2016, the alleged onset date. (R. 139.) At step two, the ALJ determined that the following impairments were severe: "degenerative disc disease of the lumbar spine, status-post laminectomy/fusion surgery at L4-L5 in 2013, diabetes mellitus, glaucoma of left eye, asthma, obesity, adjustment disorder with dysphoria and anxiety." (*Id*.)

At step three, the ALJ found that Montgomery did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter the Listings). (R. 140.) The ALJ specifically considered Listings 1.04, 2.03, 2.04, 3.03, 8.04, 9.00, 11.14, 12.04 and 12.06. (*Id*.) The ALJ ruled out each of these Listings because the record did not demonstrate the medical findings necessary to meet the necessary criteria. (R. 140-42.)

The ALJ then assessed Plaintiff's RFC and determined that she was able:

[T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she cannot climb ropes, ladders, or scaffolds; she cannot work at heights; she can only occasionally climb ramps and stairs; she can occasionally stoop; she can never crawl; she must avoid concentrated exposure to dust, fumes, pulmonary irritants, and temperature extremes; she would require a job that requires no more than occasional peripheral vision and which would not require the use of

automotive equipment or operating dangerous machinery; and she would need a job requiring no more than occasional decision-making and occasional changes and work setting.[6]

(R. 142.) With respect to Plaintiff's back impairments, the ALJ found that they resulted in "some degree of functional limitation, but not to the extent alleged." (R. 143.) Among other medical evidence, the ALJ cited to Dr. Nieto's February 2017 assessment that Plaintiff was stable and could return to normal activities. (*Id*.) The ALJ gave partial weight to Dr. Fkiaras's opinion, concluding that the portion of his opinion restricting Plaintiff from ""'ny' exertional or postural limitations [wa]s overly broad and inconsistent with [his own] examination." (R. 145.)

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work and proceeded to step five. (R. 145.) At step five, the ALJ considered Plaintiff's age, education and job skills, along with her RFC determination, and, based on testimony from the VE, concluded that there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including cleaner/housekeeper, bakery racker and garment folder. (R. 146-47.) Therefore, the ALJ found Plaintiff was not disabled during the relevant period and denied her claim for benefits. (R. 147.) Following the ALJ's decision, Montgomery sought review from the Appeals Council, which denied her request on April 9, 2020. (R. 1-4.)

---

[6] "Frequently" and "occasionally" are terms of art under Social Security regulations. *See, e.g.*, *Rivera v. Comm'r of Soc. Sec.*, 394 F. Supp. 3d 486, 496 (S.D.N.Y. 2019) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)). Frequently means "from one-third to two-thirds of the time." Social Security Regulation ("SSR") 83-14. Occasionally means "very little up to one-third of the time." *Id.*

**LEGAL STANDARDS**

## I.     Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is 'a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless 'a reasonable factfinder *would have to conclude otherwise*.'" *Banyai v. Berryhill*,

767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (quoting *Brault*

*v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original)

(internal quotation marks omitted). If the findings of the Commissioner as to any fact are

supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307,

312 (2d Cir. 1995).

II.     **Determination Of Disability**

        A person is considered disabled for benefits purposes when she is unable "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if [the combined
> effects of] his physical or mental impairment or impairments are of such severity
> that he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work exists
> in the immediate area in which he lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

        In determining whether an individual is disabled, the Commissioner must consider:

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts;

(3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the

claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d

1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "When determining whether a claimant is disabled due to a mental impairment, an ALJ must apply a 'special technique' at the second and third steps of the five-step framework.'" *Cherry v. Comm'r of Soc. Sec.*, No. 17-CV-07999 (VEC), 2019 WL 1305961, at *11 (S.D.N.Y. Mar. 22, 2019) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). First, the ALJ must determine if the claimant has a "medically determinable mental impairment." *Id*. (quoting *Kohler*, 546 F.3d at 265-66). If the claimant is found to have such an impairment, the ALJ must "rate the

degree of functional limitation," across "four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id*. (quoting 20 C.F.R. § 404.1520a(b)-(c)).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52.

## DISCUSSION

Plaintiff argues that this action should be remanded to the Commissioner for further proceedings because: (1) the ALJ's RFC determination is not supported by substantial evidence; (2) the ALJ failed to reconcile an apparent conflict between the VE's testimony and the Department of Labor's Dictionary of Occupational Titles ("DOT"); and (3) the ALJ failed to consider the impact of Plaintiff's need for an assistive device in her ability to perform light work. (Pl.'s Mem., ECF No. 14, at 9-12.) The Court addresses each of these arguments in turn.

## I.      The ALJ's RFC Determination

First, Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence in the record and that there is "substantial contrary evidence to support limitations would erode Plaintiff's ability to perform a full range of light work." (Pl.'s Mem. at 9.) Plaintiff argues that the opinion of Dr. Fkiaras, Dr. Nieto's recommendation that she use a cane, and own testimony, support a finding that she cannot perform light work. (*Id*. at 9-10.) However, "whether there is substantial evidence supporting the [plaintiff's] view is not the question . . . rather, [the Court] must decide whether substantial evidence supports *the ALJ's decision*." *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."); *Jones v. Berryhill*, 415 F. Supp. 3d 401, 411 (S.D.N.Y. 2019) ("[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists.") (citations omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

While Plaintiff has pointed to evidence that could support a finding of disability, she has not shown that the ALJ's decision was unsupported by substantial evidence. Indeed, the ALJ's RFC determination is supported by Dr. Nieto's assessment that Plaintiff could return to normal activities, as well as treatment notes showing relatively normal physical examination findings. (R. 143-45.) With respect to cane use, the ALJ discussed both Plaintiff's testimony that she used a cane to ambulate (R. 142) and Dr. Nieto's recommendation that she use a cane (R. 143), but explained that he did not include cane use in Plaintiff's RFC because she exhibited a normal gait

and used no assistance device during her consultative examination. (R. 145.) The ALJ also noted

that, although Plaintiff has been observed ambulating with a cane, treatment records showed a

normal and steady gait once she was no longer drowsy from sleep aides. (*Id*. (citing R. 1018,

1055).) Accordingly, I find no basis to remand based on the ALJ's RFC determination.

## II.     Alleged Conflict Between VE's Testimony And DOT Titles

Plaintiff next argues that the ALJ failed to reconcile an apparent conflict between the VE's

testimony and the DOT. (Pl.'s Mem. at 10-11.) In particular, Plaintiff contends that the jobs of

cleaner/housekeeper (DOT 323.687-014) and bakery racker (DOT 524.687-018), which the VE

testified a hypothetical person with Plaintiff's RFC could perform (*see* R. 632-33), would require

interaction with machines and frequent exposure to dust, fumes and pulmonary irritants, and

would involve working at heights. (Pl.'s Mem. at 11.) Plaintiff argues that the requirements of

these jobs conflict with the ALJ's RFC assessment, which stated that Plaintiff must avoid

concentrated exposure to dust, fumes and pulmonary irritants and that Plaintiff cannot work at

heights, and that this conflict warrants remand pursuant to Social Security Ruling ("SSR") 00-4p.[7]

(*Id.*)

The Court finds that there is no apparent conflict between the VE's testimony and the

DOT. With respect to the job of cleaner/housekeeper (DOT 323.687-014), Plaintiff contends that

this job "requires cleaning lint, dust, oil, and grease from machines, using brushes, air hoses, and

---

[7] "[SSR] 00-4P states that '[w]hen there is apparent unresolved conflict between VE . . . evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.'" *Steven N. v. Berryhill*, No. 17-CV-00427, 2018 WL 6629681, at *14 (W.D.N.Y. Dec. 19, 2018) (quoting SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000)).

steam cleaner" and that the job also requires "frequent exposure to dust, fumes, and pulmonary irritants." (Pl.'s Mem. at 11.) However, the DOT provides that a cleaner/housekeeper:

> Cleans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories, performing any combination of following duties: Sorts, counts, folds, marks, or carries lines. Makes beds. Replenishes supplies, such as drinking glasses and writing supplies. Checks wraps and renders personal assistance to patrons. Moves furniture, hangs drapes, and rolls carpets. Performs other duties as described under CLEANER (any industry) I Master Title.

Dictionary of Occupational Titles, 323.687-014 Cleaner, Housekeeping, 1991 WL 672783

(4thed., 1991). This description also incorporates by reference the duties described under the

Master Title CLEANER I (any industry), which include:

> Maintains premises of commercial, institutional, or industrial establishments, office buildings . . .  or similar establishments in clean and orderly condition, performing the following duties: Cleans rooms, hallways, lobbies, lounges, rest rooms, . . . and other work areas. Sweeps scrubs, waxes, and polishes floors, using brooms and mops and powered scrubbing and waxing machines. Cleans rugs, carpets, upholstered furniture, and draperies, using vacuum cleaner. Dusts furniture and equipment. Polishes metalwork, such as fixtures and fittings. Washes walls, ceiling, and woodwork. Washes windows, door panels, and sills. Empties wastebaskets, and empties and cleans ashtrays. Transports trash and waste to disposal areas. Replenishes bathroom supplies. Replaces light bulbs.

DOT, Cleaner I, 1991 WL 645969 (4th ed., 1991). Neither of these DOT job descriptions include the requirements asserted by Plaintiff related to exposure to irritants and the operation of heavy machinery. Rather, it appears that Plaintiff has mistakenly referenced the job responsibilities of "CLEANER, INDUSTRIAL (any industry)" (DOT code 381.687-018), which are not applicable to the VE's testimony. *See* DOT, 381.687-018 Cleaner, Industrial, 1991 WL 673258 (4th ed., 1991).

Further, with respect to the job of bakery racker, Plaintiff contends that this job "requires conveying material manually and by use of machines and equipment, such as cranes, hoists, conveyors, industrial trucks, elevators, winches, and hand trucks." (Pl.'s Mem. at 11) (internal

quotation marks omitted.) However, Plaintiff does not cite a source for this description and the Court cannot determine it. The DOT provides that a bakery racker: "[l]oads wire racks with cookies, crackers, and wafers preparatory to their being dipped in icing: Removes wire rack from overhead trolley conveyor and places products on rack. Lifts and hooks rack to conveyor. May impale products on pins of wire rack and be designated Sticker (bakery products)." DOT, 524.687-018 Racker, 1991 WL 674400 (4th ed., 1991). The DOT description of bakery racker does not make any reference to the responsibilities asserted by Plaintiff related to the use of heavy machinery.

Finally, Plaintiff asserts that "both these jobs involve working at heights which exceeds the residual functional capacity assessment." (Pl.'s Mem. at 11.) However, Plaintiff cites nothing to support this position. Neither the DOT description of cleaner/housekeeper nor the DOT description of bakery racker reference the requirement of working at heights. *See* DOT, 323.687-014 Cleaner, Housekeeping, 1991 WL 672783; DOT, 524.687-018, 1991 WL 674400. Thus, the Court finds that there is no apparent conflict between the VE's testimony and the DOT.

In any event, any error relating to the cleaner/housekeeper and bakery racker jobs would be harmless, because the VE also testified that Plaintiff could perform the job of garment folder, which Plaintiff does not challenge. *See Steven N.*, 2018 WL 6629681, at *14 (noting error in failing to reconcile apparent conflict with one job identified by VE was harmless when VE also identified other jobs plaintiff could perform) (citing *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) ("The Commissioner need show only one job existing in the national economy that [the plaintiff] can perform.")).

### III.    **Plaintiff's Use Of An Assistive Device**

Plaintiff also argues that remand is required because the ALJ did not consider the impact of her need for an assistive device on her ability to perform the physical demands of unskilled work. (Pl.'s Mem. at 11-12.) However, as set forth above, the ALJ discussed evidence related to Plaintiff's cane use (R. 142-43), but explained that she did not include cane use in Plaintiff's RFC because Plaintiff exhibited a normal gait and used no assistance device during her consultative examination. (R. 145.) Thus, the ALJ adequately addressed Plaintiff's cane use. *See Puckett v. Berryhill*, No. 17-CV-05392 (GBD) (KHP), 2018 WL 6625095, at *18 (S.D.N.Y. July 13, 2018); *Francois v. Astrue*, No. 09-CV-06625 (HB), 2010 WL 2506720, at *8 (S.D.N.Y. June 21, 2010) (rejecting plaintiff's argument that ALJ failed to consider his use of cane where ALJ noted observations of plaintiff's doctors regarding plaintiff's use of a cane).

In any event, the VE testified that, even if Plaintiff needed a cane to ambulate, she could still perform the job of garment folder.[8] (R. 637-38.) Accordingly, any error on this point would be harmless. *See*, *e.g.*, *Sokolowski v. Comm'r of Soc. Sec.*, No. 13-CV-00744 (GLS), 2014 WL 2532485, at *4 (N.D.N.Y. June 5, 2014) (holding that ALJ's failure to include limitation in RFC as at most, harmless error when VE identified jobs plaintiff could perform even with limitation); *see also Johnson v. Comm'r of Soc. Sec.*, No. 18-CV-00507 (MJR), 2019 WL 3406610, at *5 (W.D.N.Y. July 29, 2019) (finding any error to impose limitation regarding cane usage was at most, harmless)

---

[8] The Court notes that the VE's testimony is somewhat unclear, as the VE testified that the cleaner/housekeeper and garment folder jobs would still be available for a hypothetical person who needed a cane only to ambulate, but when the ALJ then asked if "just the folder would still remain," the VE answered "yes." (R. 638.) In any event, because the testimony is clear that at least the garment folder job would be available, the Court need not not address the inconsistency with respect to the cleaner/housekeeper job.

(citing *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) ("Even if the ALJ erred regarding the cane, though, any error was harmless as he asked the vocational expert to take the cane into account and there were still jobs available that appellant could perform.")).

## CONCLUSION

For the reasons set forth above, Plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED.

**SO ORDERED.**

DATED:      New York, New York
            June 23, 2021

_____
STEWART D. AARON
United States Magistrate Judge